UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN T. MISKO,<br><br>       Plaintiff,<br><br>   v.<br><br>WILLIAM SULLIVAN, et al.,<br><br>       Defendants. | Case No.: 1:10-cv-00713-LJO-BAM PC<br><br>FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br>(ECF No. 32) |

**I.     Introduction**

Plaintiff John T. Misko ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This action proceeds on Plaintiff's amended complaint, filed on December 27, 2010, against Defendants Cleinlin, Williams, Priest and Tate for deliberate indifference in violation of the Eighth Amendment.[1]  Currently before the Court is Defendant Tate's and Defendant Priest's motion for summary judgment filed on February 25, 2013.[2] Plaintiff opposed the motion on May 20, 2013, and Defendants replied on June 21, 2013.  The motion is deemed submitted.  Local Rule 230(l).

---

[1]     To date, Defendants Cleinlin and Williams have not been served with the summons and amended complaint.  On September 23, 2013, the Court directed the United States Marshal to re-serve these defendants based on new information provided by Plaintiff.

[2]     Concurrent with the motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment. (ECF No. 32-1); see Woods v. Carey, 684 F.3d 934 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1988); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

1

## II. Defendants' Motion for Summary Judgment

### A. Legal Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a) summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Summary judgment must be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  However, the court is to liberally construe the filings and motions of pro se litigants.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323 (internal quotations and citations omitted).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record for consideration.  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not undertake to scour the record for triable issues of fact.  Simmons v. Navajo County, Arizona, 609 F.3d 1011, 1017 (9th Cir. 2010).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts

and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### B. Summary of Relevant Allegations in First Amended Complaint

Following screening, this action is limited to Plaintiff's claim against Defendants Cleinlin, Priest and Williams for failing to respond to Plaintiff's pain, and against Defendant Tate for removing a medical hold in violation of the Eighth Amendment. (ECF Nos. 12, 13.) In relevant part, Plaintiff alleges as follows:

On December 29, 2006, Plaintiff was getting down from the top bunk in his cell at CCI Tehachapi to use the toilet. Plaintiff's foot slipped off the stool and his right foot landed sideways hard on the floor. Plaintiff experienced extreme pain, hot flashes and broke out in a cold sweat. He told his cell mate, Kenneth Nowlin, "My ankle is broken." Mr. Nowlin looked at Plaintiff's ankle and agreed that it appeared to be broken. Mr. Nowlin then called "man down" and a correctional officer came to Plaintiff's cell. The correctional officer observed Plaintiff's ankle and called medical staff. Plaintiff was placed in a wheelchair and escorted to the facility infirmary where he was examined by Dr. Allan Yin. Plaintiff subsequently was transported to San Joaquin Community Hospital.

At San Joaquin Community Hospital, Plaintiff's ankle was x-rayed. The x-rays confirmed that his ankle was broken. Plaintiff was given pain medication, a temporary splint and a prescription for oral Vicodin, with instructions for examination by an orthopedic specialist within 48 hours. Plaintiff was returned to CCI and issued a pair of crutches. Plaintiff was not allowed to use the crutches in his cell and had to hop. Plaintiff could not sleep due to pain.

On December 30, 2006, Plaintiff was seen at his cell door by Nurse Baker, who gave Plaintiff Tylenol 3. Plaintiff told Nurse Baker that he had been prescribed Vicodin for the pain. Nurse Baker agreed to check into it. Later that day, Nurse Baker gave Plaintiff more Tylenol. Plaintiff again said that he had been prescribed Vicodin for the pain. Nurse Baker replied, "Whatever," and walked away.

On the same day, Plaintiff was given Tylenol 3 by Defendant Cleinlin. Plaintiff told Defendant Cleinlin that he was in a great amount of pain even though he was taking the Tylenol. He

1  also reported that he had been prescribed Vicodin for the pain.  Defendant Cleinlin replied that he
2  would look into it.
3       From January 1 through January 12, 2007, Plaintiff was in extreme pain and without the use of
4  crutches in his cell.  Plaintiff complained daily to Defendants Cleinlin and Priest that Tylenol was not
5  adequate to control pain and that he had been prescribed Vicodin.  Defendants Cleinlin and Priest
6  disregarded Plaintiff's repeated complaints and took no action to ease his extreme and chronic pain.
7       On January 2, 2007, Plaintiff was seen by Nurse Practitioner Jartu McConnell.  Plaintiff told
8  Nurse McConnell that he was supposed to have seen a specialist within 48 hours of December 29,
9  2006.  Plaintiff asked why he had not been seen by a specialist regarding his broken ankle.  Nurse
10 McConnell did not respond to Plaintiff's question, but stated that she would submit a request for
11 Plaintiff to see an orthopedic specialist.
12      On January 5, 2007, Plaintiff submitted two health care requests complaining that his
13 temporary splint was coming loose and causing substantially more pain.  Plaintiff also reported that
14 the splint had been on for well over the 48-hours for which it had been intended.
15      From January 5 through January 9, 2007, Plaintiff complained to Defendants Cleinlin and
16 Priest about the worsening condition of the temporary splint and how it was increasingly causing more
17 pain.  Defendants Cleinlin and Priest took no action.
18      On January 9, 2007, Plaintiff's temporary splint fell off while he was showering.  Plaintiff was
19 escorted to the facility infirmary on an emergency basis due to his temporary splint falling off.  At the
20 infirmary, Defendant Williams placed another temporary splint on Plaintiff's ankle.  The splint placed
21 a great amount of pressure and caused immediate and extreme pain to his injured ankle.  Plaintiff
22 immediately informed Defendant Williams that there was a problem with the splint and it was causing
23 pressure and extreme pain.  Defendant Williams replied, "That's all we can do."  Plaintiff was
24 dismissed and returned to his cell.  That same day, Plaintiff submitted an "Inmate Request for
25 Interview" (CDCR form GA-22) to medical.  Plaintiff reported that the temporary splint applied that
26 day was causing constant pain.
27      Two days later, on January 11, 2007, Plaintiff was again escorted to the facility infirmary.  At
28 the infirmary, Defendant Williams added gauze to the splint and stated, "That's all we are going to

do!" Plaintiff explained to Defendant Williams that the temporary splint applied at San Joaquin Community Hospital was wrapped from side to side, not from the back as she had done. Plaintiff also stated that the way she applied the splint was pushing on the injured area of the ankle. Defendant Williams replied that Plaintiff's ankle would heal on its own. When Plaintiff asked why he had not been seen by an orthopedic specialist, Defendant Williams replied, "If you were supposed to see a specialist you would have already been seen."

Later that same day, Plaintiff was seen by Nurse McConnell. Plaintiff complained about the splint applied by Defendant Williams and the pain it was causing. Nurse McConnell stated, "There is no change." Plaintiff was dismissed and escorted to his cell.

On January 10, 2007, Nurse McConnell placed a medical "hold" on Plaintiff preventing his transfer due to necessary medical treatment.

On January 17, 2007, Dr. Marshall Lewis examined Plaintiff at Tehachapi Surgical Center. As the examination progressed, Dr. Lewis became more agitated and disturbed. Dr. Lewis stated that Plaintiff should have been seen weeks ago and because he had missed a critical window for follow-up there would likely be permanent damage to the ankle. Dr. Lewis then placed a phone call and appeared to be speaking to the CCI Chief Medical Officer, Defendant Tate. Dr. Lewis stated that because Plaintiff had not been attended to in a competent manner, he likely would suffer permanent damage to his ankle. Dr. Lewis then asked who was responsible. He then stated, "You're the Chief Medical Officer, you are responsible for proper care." After a pause, Dr. Lewis continued, stating "I understand your budget concerns but now it's going to cost at least five[] times what it would have to fix this."

Later that day, Dr. Lewis performed surgery on Plaintiff's ankle. Dr. Lewis informed Plaintiff that it was emergency surgery due to the inattention of medical staff and the deterioration in the condition of his ankle. Dr. Lewis installed a plate, six screws and two pins. Following surgery, a full cast was applied to Plaintiff's lower leg and foot, including the injured ankle. Before he was released from Tehachapi Surgical Center, Dr. Lewis told Plaintiff that he was to return in two weeks for critical follow-up to the emergency surgery.

1      On January 26, 2007, Defendant Priest started to pass Plaintiff's cell without giving him his
2  prescribed medication.  Plaintiff stopped her and inquired about his medication.  Defendant Priest
3  replied, "I'm not giving you shit."  Defendant Priest then walked away.
4      Later that same day, Defendant Cleinlin gave Plaintiff his prescribed medication.  When
5  Plaintiff inquired about not getting his morning and noon medications, Defendant Cleinlin replied, "I
6  don't know, it says that you are supposed to get it three times a day."
7      On January 27, 2007, Defendant Priest was passing out morning medications to other cells.
8  Plaintiff tried to get her attention to ask about his medication.  Defendant Priest looked at Plaintiff, but
9  would not respond and walked past Plaintiff's cell without speaking.
10     On February 1, 2007, at approximately 6:00 a.m., Plaintiff awoke to excruciating pain in his
11 injured ankle.  When Defendant Priest passed by Plaintiff's cell at 7:00 a.m., he informed her of this.
12 Defendant Priest looked at Plaintiff, but expressed no concern and walked away.  At noon, the same
13 thing happened.
14     That evening, Plaintiff informed Defendant Cleinlin about the excruciating pain in his injured
15 ankle.  Defendant Cleinlin replied, "It's always something with you."  Defendant Cleinlin walked
16 away.
17     On February 7, 2007, Plaintiff was escorted to Tehachapi Surgical Center.  Dr. Lewis removed
18 Plaintiff's cast and stitches and applied a new cast to Plaintiff's ankle.  At that time, Dr. Lewis
19 submitted a referral for a follow-up appointment in 30 days.
20     Defendant Tate's memorandum dated February 17, 2007, indicated that he was aware of
21 Plaintiff's follow-up appointment necessary 30 days after February 7, 2007.  From his experience as
22 Chief Medical Officer, Defendant Tate was aware that transferring a patient to another prison entailed
23 substantial delay in a patient's course of treatment because medical records were not sent with the
24 patient and the patient had to be scheduled for evaluation at the new prison.  The patient also had to be
25 referred and scheduled to see an outside specialist and the prison had to provide officers to escort the
26 patient to an outside specialist.  Despite this knowledge, Defendant Tate knowingly caused the
27 medical transfer "hold" placed on Plaintiff to be lifted.
28

On March 22, 2007, Plaintiff was transferred to Kern Valley State Prison in Delano before the follow-up had taken place. As a result of the delay caused by Defendant Tate lifting the medical "hold" and Plaintiff's subsequent transfer, Plaintiff needed additional surgery to remove scar tissue from his ligaments and had permanent damage to his ankle.

On April 11, 2007, Plaintiff was escorted to Tehachapi Surgical Center. Dr. Lewis removed the pins and two of the screws from Plaintiff's right ankle. Dr. Lewis informed Plaintiff that the surgery should have been performed on March 5, 2007, thirty days after he had applied the new cast. Dr. Lewis stated that each additional day of delay causes more damage to his ankle and informed Plaintiff that he was to return again in two weeks.

On May 30, 2007, Plaintiff was escorted to seek Dr. Lewis for follow-up to the April 11, 2007 surgery.

On November 21, 2007, Plaintiff received additional surgery for the removal of the remaining hardware that was installed on January 17, 2007. Plaintiff's ligaments in his ankle were scraped to remove scar tissue caused by the pins being left in his ankle past the medically necessary period.

On February 6, 2008, Plaintiff was examined by Dr. Lewis, who scheduled Plaintiff for additional surgery in March 2008.

### C. Statement of Undisputed Material Facts ("UMF")

1. This case proceeds on First Amended Complaint against Defendant Priest for failing to respond to Plaintiff's pain, and Defendant Tate for removing the medical hold in violation of the Eighth Amendment.[3] (ECF No. 12, p. 7, Order dated October 31, 2011.)
2. Plaintiff was housed at the California Correctional Institution ("CCI") on December 29, 2006, when he injured his right ankle, through March 22, 2007, when he was transferred to Kern Valley State Prison. (ECF No. 8, First Amended Complaint.)
3. Defendant Priest worked as a relief LVN at CCI during this time period, and her work responsibilities included administering prescribed medications to the inmates, providing

---

[3] As noted by Plaintiff and the Court, this action also proceeds against Defendants Cleinlin and Williams for failing to respond to Plaintiff's pain. (ECF No. 12, p. 7; ECF No. 35, p 16.) However, service has not been completed on these two defendants and they have not appeared in this action.

7

blank Health Care Services Request forms to inmates, and forwarding completed Health Care Services Request forms to the nurse(s) in charge of the clinic or yard for the nurse to determine any further appropriate medical follow up. (ECF No. 32-4, Declaration of Priest ("Priest Dec.") ¶ 2.)

4. Dr. Tate worked as the Chief Medical Officer (CMO) at CCI during this time period. His work responsibilities included supervising medical staff at CCI, reviewing and responding to inmate health appeals, and handling administrative issues at the institution regarding medical issues. (ECF No. 32-5, Declaration of Tate ("Tate Dec.") ¶ 2.)

5. As CMO, Dr. Tate was not a primary care physician (PCP), and did not provide direct medical treatment to inmates.[4] (Tate Dec. ¶ 2.)

6. Plaintiff suffered a fracture of his right ankle on Friday, December 29, 2006, at CCI. He was transported to San Joaquin Community Hospital for treatment, where a splint was placed on Plaintiff's ankle, and he was discharged the same day. Plaintiff was prescribed Vicodin for pain, with the prescription specifically noting "Ok to Substitute."[5] (Priest Dec. ¶ 4 and Ex. A; Tate Dec. ¶ 4 and Ex. A.)

7. After Plaintiff returned to CCI that same evening, Dr. Yin telephonically issued a Physician's Order in which he prescribed Tylenol with Codeine, and Motrin (800 mg) for fifteen days. Due to the New Year holiday weekend, Dr. Yin ordered that the nurses check on Plaintiff regularly and for Plaintiff to follow up with a medical doctor in a couple of days.[6] (Priest Dec. ¶ 5; Tate Dec. ¶ 5.)

8. Because many inmates are reliant on various legal and illegal drugs during their incarceration, prison medical staff must be very careful in prescribing pain medications

---

[4] Plaintiff's assertion that Defendant Tate had "knowledge" or "knew of" Plaintiff's situation or pin removal surgery does not raise a genuine dispute of fact. (ECF No. 35, p. 18.) Defendant Tate's purported knowledge does not create a triable issue that he provided any <u>direct</u> medical treatment to inmates.

[5] Plaintiff's assertion that he was given the Vicodin prescription for effective pain management, but he was always given and continued on "Tylenol 3" does not raise a genuine dispute of fact regarding the existence and content of the notation on the Vicodin prescription regarding substitutions.

[6] Plaintiff's assertion that he never saw a doctor and only had contact with Nurse Practitioner McConnell does not raise a genuine dispute of material fact. Plaintiff admitted that Nurse Practitioner McConnell received her orders over the phone. Further, Plaintiff's claim that there is "no paperwork" showing that Tylenol 3 was a substitute also does not create a dispute regarding the content of Dr. Yin's orders.

8

because of their potentially harmful effects, including addiction, overdose, and serious side effects. Vicodin is not one of the approved medications for inmates. Prison physicians are to utilize their expertise to prescribe other types of pain medications for inmates, including Tylenol with Codeine and Motrin.[7]  (Tate Dec. ¶ 6.)

9. Moreover, because many inmates complain of extreme pain and discomfort in the hopes of obtaining more quantities, higher strengths, of pain medications beyond what is medically indicated, prison medical staff must also be very careful to not over-prescribe pain medication simply because an inmate makes subjective complaints of pain.[8]  (Tate Dec. ¶ 7.)

10. It is Dr. Tate's medical expert opinion that Tylenol with Codeine and Motrin were medically appropriate medications for Plaintiff's fracture and to treat his complaints of pain.[9]  (Tate Dec. ¶ 8.)

11. On January 1, 2007, Plaintiff was evaluated by Registered Nurse Bennett, and it was noted that he had good circulation and sensation, and could wiggle his toes well.  (Priest Dec. ¶ 6; Tate Dec. ¶ 9.)

12. On January 2, 2007, Plaintiff had a follow up appointment with Nurse Practitioner McConnell, during which it was noted that Plaintiff was ambulatory using his crutches, had a splint cast on his right lower extremity, able to wiggle all toes, and had good capillary refills and blood circulation. He was referred to an urgent orthopedic consult, for an x-ray of his right leg/ankle, to continue with current pain management, and return in two weeks

---

[7] Plaintiff's assertion that he was told that his fractured ankle was one of the most painful and that Tylenol with Codeine would not help does not raise a genuine dispute regarding whether or not Vicodin is one of the approved medications for inmates. Plaintiff's assertion that he is being discriminated against because of other inmates also does not raise a genuine dispute. Plaintiff also attempts to create a triable issue by claiming that he has not come into contact with anyone that thinks Tylenol and Motrin helps with pain management of a fracture. Plaintiff has not presented any expert medical testimony regarding this claim and Plaintiff's conclusory assertions are not sufficient. See Clouthier v. County of Contra Costa, 591 F.3d. 1232, 1252 (9th Cir. 2010).

[8] Plaintiff's assertion that he is being lumped in a group with other inmates does not raise a triable issue of fact. Defendants' statement relates to general considerations regarding the administration of pain medications in a prison setting.

[9] Plaintiff asserts that Dr. Tate's opinion is directly contradicted because Dr. Butler, at San Joaquin Community Hospital, prescribed Vicodin after Plaintiff told him that he received Tylenol with Codeine. This does not create a genuine dispute regarding Dr. Tate's opinion. At best, it suggests a possible difference of medical opinion between two physicians, which does not rise to the level of a constitutional violation. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Further, Plaintiff has not presented any medical expert testimony to contradict Dr. Tate's opinion.

for follow up. Nurse Practitioner McConnell completed a Health Care Services/Physician Request for Services (CDC 7243 form) to that effect.[10] (Priest Dec. ¶ 7; Tate Dec. ¶ 10.)

13. Neither LVN Priest nor Dr. Tate was personally involved in the scheduling of follow up medical appointments or specialty consultations for Plaintiff.[11] (Priest Dec. ¶ 16, Tate Dec. ¶ 24.)

14. On January 5, 2007, Plaintiff submitted two Health Care Services Request forms, both dated January 5, 2007, in which he complained about his splint and pain. Health Care Services Request forms #625129 and #625130 were received and reviewed on or about January 6, 2007, and the triage registered nurse in charge noted that Plaintiff had been seen by NP McConnell on January 9, 2007, and that she had replaced his splint.[12] (Priest Dec. ¶ 8; Tate Dec. ¶ 11.)

15. On January 10, 2007, NP McConnell noted in her notes "hold patient transfer until ortho sees patient next week."[13] (Tate Dec. ¶ 13.)

16. As CMO, the placement or removal of any medical hold on transfers does not come to Dr. Tate's attention.[14] (Tate Dec. ¶ 14.)

---

[10] Plaintiff's assertion that this was not a follow up appointment, but was the first time that he was seen by any medical staff at CCI does not raise a genuine dispute of fact. Plaintiff was being seen in follow up to his fractured ankle. Plaintiff also asserts that the medical records show that Tylenol with Codeine was continued, not that it was substituted for Vicodin. This does not raise a genuine dispute regarding Nurse Practitioner McConnell's findings on examination or that Plaintiff's continuation current pain management.

[11] Plaintiff claims that Defendant Tate was personally involved because an e-mail received from the Prison Law Office dated February 14, 2007, and signed by Defendant Tate showed personal knowledge of a medical appointment and specialty consultation. The Court has reviewed the evidence cited by Plaintiff. (ECF No. 35, p. 101.) However, the fact that Defendant Tate acknowledged a future follow-up appointment with an orthopedic surgeon does not raise a triable issue regarding Defendant Tate's scheduling of appointments. In other words, the evidence relied upon by Plaintiff does not support his claim that Defendant Tate was responsible for scheduling medical appointments.

[12] Plaintiff's assertions that he was told that he should be seeing an ortho/specialist soon and that he was not allowed to use his crutches does not raise a triable issue of fact. Plaintiff also claims that his splint was replaced by Defendant Williams, not NP McConnell. The triage nurse indicated that NP McConnell replaced Plaintiff's splint. (ECF No. 32-5, pp. 15, 16.) However, treatment notes state that Defendant Williams, not NP McConnell, splinted Plaintiff's left ankle on January 9, 2007. (ECF No. 32-5, p. 17.) This does not raise a triable issue of fact regarding the claims against Defendants Tate and Priest.

[13] Plaintiff attempts to dispute this fact by complaining that Defendant Tate did not do more to supervise his staff. Plaintiff also asserts NP McConnell knew of Plaintiff's pin removal surgery. (ECF No. 35, p. 26-27.) The evidence and assertions relied upon by Plaintiff do not raise a genuine dispute of fact regarding the content of NP McConnell's notes and the duration of the hold.

17. Under the general policies and procedures in place during the early 2007 time frame, a transfer hold for medical reasons was placed if an inmate was scheduled for pending surgery; however, the medical hold no longer existed once the procedure, such as Plaintiff's orthopedic consultation and surgery with Dr. Lewis, occurred.[15]  (Tate Dec. ¶ 15.)

18. On January 12, 2007, Plaintiff was continued on Tylenol with Codeine.  (Tate Dec. ¶ 16.)

19. On January 17, 2007, Plaintiff had a consultation with Dr. Lewis, a non-prison orthopedic specialist, and Dr. Lewis performed right fibula surgery on Plaintiff and requested a follow up in two weeks.  (Tate Dec. ¶ 17.)

20. According to NP McConnell's January 10, 2007 notes, the prior patient transfer hold was in place only until Plaintiff's January 17, 2007 consultation with Dr. Lewis, and Plaintiff's UHR showed no additional holds place by CCI medical staff that would preclude Plaintiff from being considered eligible for transfer.[16]  (Tate Dec. ¶ 18.)

21. It was noted on a January 25, 2007 Interdisciplinary Progress Note from NP McConnell that Plaintiff was able to ambulate on crutches, wiggle all toes, and had good capillary refills in his toes, with no signs of cast constrictions.  Plaintiff was to continue on his antibiotics and pain management, and follow up with the orthopedist in two weeks.  (Tate Dec. ¶ 19.)

22. On February 7, 2007, Plaintiff saw Dr. Lewis again, and NP McConnell's February 8, 2007 Interdisciplinary Progress Note noted that Plaintiff was clinically stable, able to wiggle and move all toes, and the plan was to continue his pain management.  (Tate Dec. ¶ 20.)

---

[14] Plaintiff attempts to dispute this fact by contending that his medical issues were brought to Defendant Tate's attention and because of Defendant Tate's job responsibilities.  Plaintiff has not raised a genuine dispute of fact regarding whether the placement or removal of a medical hold comes to Defendant Tate's attention.

[15] Plaintiff contends that the policy was not followed because he was scheduled for surgery on February 7, 2007. (ECF No. 35, p. 29.) That Plaintiff was scheduled for surgery does not raise a genuine dispute of material fact.  NP McConnell did not issue the hold based on any pending surgery.  Rather, the hold, issued on January 10, 2007, remained in place only until Plaintiff saw Dr. Lewis on January 17, 2007.  (Tate Dec. ¶ ¶13, 16.)

[16] Plaintiff attempts to dispute this fact by pointing to his additional surgery on February 7, 2007.  (ECF No. 35, p. 31.)  Plaintiff has not raised a genuine dispute regarding the substance of NP McConnell's notes, the length of the transfer hold, and the lack of additional holds placed by CCI medical staff.

23. On February 20, 2007, Plaintiff was set up for a follow up appointment with Dr. Lewis on March 28, 2007. (Tate Dec. ¶ 21.)

24. On or around March 17, 2007, Registered Nurse Thompson at CCI completed a Confidential Medical/Mental Health Information Transfer-Sending Institution form (CDC 7371) authorizing Plaintiff's transfer to Kern Valley State Prison. (Tate Dec. ¶ 22.)

25. As CMO, Defendant Tate was not involved in Plaintiff's direct medical care. (Tate Dec. ¶ 23.)

26. Defendant Tate was not personally involved in authorizing Plaintiff for transfer to another prison. No medical hold existed for Plaintiff because NP McConnell's original medical hold was in place only until Plaintiff had seen Dr. Lewis on January 17, 2007. (Tate Dec. ¶ 25.)

27. Plaintiff continued to see Dr. Lewis in 2007 and 2008, and Dr. Lewis discharged Plaintiff from follow up in September 2008. (Tate Dec. ¶ 27.)

28. Defendant Priest had no authority regarding what medications were prescribed to Plaintiff. (Priest Dec. ¶ 15.)

**D. Discussion**

**1. Request for Default Judgment Against Defendant Williams**

In his opposition to the motion for summary judgment, Plaintiff requests default judgment against Defendant Williams. Plaintiff's request is premature. Defendant Williams has not been served with summons and complaint in this matter. On February 1, 2013, the United States Marshals Service returned the summons unexecuted as to Defendant Williams. (ECF No. 31.) Subsequently, Plaintiff supplied additional information to effectuate service on Defendant Williams, and the Court has issued an order directed the United States Marshals Service to re-serve the summons and complaint on Defendant Williams based on that information. (ECF Nos. 41, 43.) To date, the Court has no evidence that Defendant Williams has been served with the summons and complaint and is in default. Accordingly, it is recommended that Plaintiff's request for entry of default judgment against Defendant Williams be denied.

**2. Eighth Amendment - Deliberate Indifference**

A prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment in violation of the Eighth Amendment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  The two part test for deliberate indifference requires the plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096.  A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994).  "Deliberate indifference is a high legal standard," Simmons v. Navajo County Ariz., 609 F.3d 1011, 1019 (9th Cir. 2010); Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm, Jett, 439 F.3d at 1096.

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. at 105-06.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995).  Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).  Additionally, a prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference. Sanchez, 891 F.2d at 242.

///

///

Defendant Tate

Plaintiff alleges that Defendant Tate removed the medical transfer hold knowing that it would delay Plaintiff's treatment and which resulted in Plaintiff having to undergo additional surgery. Although Defendant Tate may have been aware of Plaintiff's medical issues, there is no evidence, and Plaintiff has not raised a genuine dispute of material fact, regarding Defendant Tate's role in the removal of medical holds. In particular, Plaintiff has not provided competent evidence to establish that Defendant Tate played any role in the removal of Plaintiff's medical hold or in Plaintiff's transfer to Kern Valley State Prison in March 2007. Rather, the undisputed evidence demonstrates that Defendant Tate was not involved in any placement or removal of medical transfer holds. (UMF No. 16.) The undisputed evidence also demonstrates that Defendant Tate was not personally involved in authorizing Plaintiff for a transfer to another prison. (UMF Nos. 26.) Furthermore, the only medical hold preventing transfer was put in place by Nurse McConnell on January 10, 2007, and expired on January 17, 2007. (UMF Nos. 15, 20, 26.) No other medical holds were in place that could have been removed by Defendant Tate.

To the extent that Plaintiff purports to extend liability to Defendant Tate based on his role as supervisor, including supervisor of NP McConnell, Plaintiff may not do so. Liability may not be imposed on supervisory personnel for the actions or omissions of their subordinates under the theory of respondeat superior. Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009); Simmons, 609 F.3d at 1020-21; Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). Supervisors may be held liable only if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); accord Starr v. Baca, 652 F.3d 1202, 1205-06 (9th Cir. 2011); Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009); Preschooler II v. Clark County School Board of Trustees, 479 F.3d 1175, 1182 (9th Cir. 2007); Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997). As discussed above, the Court finds that Plaintiff has not raised a triable issue of fact regarding Defendant Tate's role or personal participation in the removal of Plaintiff's medical hold and subsequent transfer. Plaintiff's own conclusory allegations are insufficient to avoid summary judgment. See Clouthier, 591

1  F.3d. at1252.  The Court will recommend that summary judgment be entered in favor of Defendant
2  Tate.

3        Defendant Priest

4        Plaintiff alleges that Defendant Priest failed to respond to his complaints regarding pain and his
5  splint.  In particular, Plaintiff contends that Defendant Priest knew his prescribed medications were not
6  controlling the pain and, on occasion, his medications were at risk of expiring.  (ECF No. 35, p. 42.)
7  However, the undisputed evidence demonstrates that Defendant Priest only administered prescribed
8  medications and had no authority regarding what mediation were prescribed to Plaintiff.  (UMF Nos.
9  3, 28.)  Furthermore, the crux of Plaintiff's complaint is not that he failed to receive medication for
10 pain, but that he should have received Vicodin not Tylenol with Codeine or Motrin.  Plaintiff's
11 disagreement with the type of medication that he received does not support a claim of deliberate
12 indifference.  Sanchez, 891 F.2d at 242.  Additionally, the undisputed evidence reflects that Vicodin is
13 not one of the approved medications for inmates.  (UMF No. 8.)

14       To the extent Plaintiff's complaint is that Defendant Priest should have been more responsive
15 to his need for treatment, the undisputed evidence demonstrates that Defendant Priest's responsibilities
16 did not include providing treatment at the clinic or on the yard and did not include the scheduling of
17 medical appointments or specialty consultations.  (UMF Nos. 3, 13.)  The evidence, including
18 Plaintiff's own exhibits, also demonstrates that during the relevant time period an urgent request for an
19 ortho evaluation of Plaintiff's ankle was submitted on January 2, 2007, and Plaintiff received
20 treatment for his ankle at the prison on January 1, 2, 6, 9, and 11, 2007.  (ECF No. 32-5, No. 35, pp.
21 52, 53, 82, 84, 101.)

22       Plaintiff further alleges that Defendant Priest failed to respond to his complaints about the
23 temporary splint from January 5 through January 9, 2007.  (ECF No. 35, p. 43.)  As noted above,
24 however, Plaintiff was seen on January 6 and his splint was replaced on January 9, 2007.  (ECF No.
25 35, pp. 82, 101).  In addition, Plaintiff complains that Defendant Priest failed to respond to his
26 complaints about the replacement splint he received on January 9, 2007.  (ECF No. 35, p. 44.)
27 Plaintiff's complaints regarding the purportedly improper application of the temporary splint do not
28 give rise to an Eighth Amendment claim.  Broughton, 622 F.2d at 460 (mere negligence or medical

15

malpractice will not support a cause of action for deliberate indifference); Estelle, 429 U.S. at 106. Moreover, the evidence demonstrates that after the splint was replaced on January 9, Plaintiff was evaluated on January 11, his pain medication was extended on January 12, 2007, and he underwent surgery on January 17, 2007.  (ECF No. 35, pp. 53, 61.)

Based on the foregoing, the Court finds that Plaintiff has failed to raise a genuine dispute for trial regarding his claim of deliberate indifference against Defendant Priest.  Accordingly, the Court will recommend granting Defendants' motion for summary judgment.

### 3. Conclusion and Order

For the reasons stated, IT IS HEREBY RECOMMENDED as follows:

1. Plaintiff's request for entry of default judgment against Defendant Williams be DENIED;
2. Defendants' motion for summary judgment, filed on February 25, 2013, be GRANTED;
3. The Clerk of the Court be directed to enter judgment in favor of <u>only</u> Defendants Tate and Priest; and
4. This action proceed against Defendants Cleinlin and Williams for deliberate indifference in violation of the Eighth Amendment.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after being served with these Findings and Recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **February 10, 2014**            /s/ *Barbara A. McAuliffe*
                                        UNITED STATES MAGISTRATE JUDGE